Filed 6/6/16

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MARGARET L. KINDA et al., | H040316 |
| Plaintiffs and Appellants, | (Santa Cruz County Super. Ct. No. CV171252) |
| v. | |
| SCOTT CARPENTER, | |
| Defendant and Respondent. | |

Commercial tenants Artisan Fine Oriental Rug Care, Inc. (Artisan) and its owners Margaret L. Kinda and Aaron Kinda (plaintiffs) sought a temporary restraining order and preliminary injunction against their landlord Scott Carpenter (defendant). The dispute centered on plaintiffs' tenancy and defendant's alleged disruption of their business. Plaintiffs alleged several contract related causes of action based on their lease. After plaintiffs obtained a temporary restraining order, three consumer reviews criticizing Artisan and Margaret Kinda appeared on the Internet site Yelp.com (Yelp) posted from different online aliases. Plaintiffs suspected defendant was responsible for the reviews and they amended the complaint to allege defamation of Artisan and Ms. Kinda. Plaintiffs also obtained via subpoena information purporting to identify the Internet subscriber accounts linked to the Yelp reviews.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exceptions of part I.D of the Background and parts II.D and II.E of the Discussion.

Defendant moved in limine to exclude the evidence related to the Yelp reviews on hearsay and authenticity grounds. The trial court granted defendant's motion and later granted a directed verdict for defendant on the defamation cause of action. A jury returned a unanimous defense verdict on the contract causes of action, which included a special verdict that although defendant had breached the lease agreement no damages resulted. The trial court deemed defendant the prevailing party and granted his request for attorney's fees.

Plaintiffs contend on appeal that the trial court erred in excluding the Yelp evidence and eliminating their defamation cause of action. Plaintiffs also contend that had the Yelp evidence been admitted, they would have established presumed damages, which would have altered both the jury's special verdict on the contract-based causes of action and the court's prevailing party determination for the attorney's fees award.

As we explain in the published portion of this opinion, the exclusion of the Yelp evidence and the resulting disposition of the defamation cause of action was error.[1] In

---

[1] Two weeks after oral argument and submission of the case (Cal. Rules of Court, rule 8.256(d)(1)), appellants filed a notice of settlement, indicating the case has settled, with dismissal conditional on the fulfillment of specified terms. The parties have not yet filed a stipulation for dismissal. A valid settlement between the parties renders the appeal moot to the extent that it "effectively extinguishes the judgment from which the appeal is taken," ending both the dispute and the possibility of further, effective relief from the court. (*Ebensteiner Co., Inc. v. Chadmar Group* (2006) 143 Cal.App.4th 1174, 1180.) Nonetheless, "[d]ismissal of the action at this extraordinarily late stage of the proceedings based on settlement or stipulation of the parties is discretionary rather than mandatory." (*Bay Guardian Co. v. New Times Media LLC* (2010) 187 Cal.App.4th 438, 445, fn. 2.) The appellate court has "inherent power to retain a matter, even though it has been settled and is technically moot, where the issues are important and of continuing interest." (*Burch v. George* (1994) 7 Cal.4th 246, 253, fn. 4; see also *Cadence Design Systems, Inc. v. Avant! Corp.* (2002) 29 Cal.4th 215, 218, fn. 2 [after settlement, court may exercise discretion and "issue an opinion 'to resolve the legal issues raised, which are of continuing public interest and are likely to recur' "].) We find this appeal presents issues of public interest that promise to recur, specifically in the emerging realm of internet-based communications, online aliases, and questions pertaining to the admissibility of

*(Continued)*

2

the unpublished portion of this opinion, we conclude that in light of the erroneous exclusion of plaintiffs' evidence supporting the defamation cause of action, the determination of the prevailing party and award of attorney's fees likewise must be reversed. Although we do not agree with plaintiff that a finding of defamation per se would have necessarily furnished damages for the breach of contract cause of action, neither can we conclude that the outcome on the contract-based causes of action would have remained unaffected by the presentation of evidence on the alleged defamation. Accordingly, the judgment must be reversed.

## I.  BACKGROUND

### A. LANDLORD-TENANT DISPUTE

After defendant and his company, Monterey Bay Spice Company, Inc.,[2] bought the commercial building housing plaintiffs' rug cleaning business, a series of disputes developed in which plaintiffs complained that defendant's behavior interfered with their business operations and amounted to a campaign of harassment and retaliation. Plaintiffs claimed that defendant's conduct, which included construction and demolition on an adjoining section of the building, requests to enter and inspect the premises, service of multiple "pay rent or quit" and similar notices, and obstructing a designated parking space, interfered with plaintiffs' business and breached the implied and express covenants of their lease. Based on defendant's alleged failure to abate the noisy construction work, on June 1, 2011 Ms. Kinda sought and received a temporary restraining order enjoining defendant's construction activities exceeding a stated decibel level during business hours. Ms. Kinda later obtained a preliminary injunction related to the noise, and a second

such evidence at trial. We therefore retain jurisdiction in order to resolve the issues presented.

[2] Monterey Bay Spice Company, Inc. settled with the plaintiffs before trial and is not a party to the appeal.

3

preliminary injunction related to defendant's requests to enter and inspect plaintiffs' business premises.

## B. POSTINGS ON YELP

Yelp is an Internet website that collects and publishes online consumer reviews of businesses. (*Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 423.) On the day the temporary restraining order issued against defendant, a negative review of Artisan appeared on Yelp, followed by two more negative reviews on the following two days. Each review was attributed to a different online alias.

The first review, posted on June 1, 2011 by "thomas j" stated that Artisan provided the "[w]orst service I have ever experienced" and described in detail purported delays, a price increase, and a stain that appeared on his carpets after leaving them with Artisan. The next day, a review of Artisan by "Sandy Z" warned, "watch out for the angry Lady that works there" and stated "I am lucky in that I had a taste of this cantankerous rug hut BEFORE I actually brought my carpet in for cleaning." The third review by "chris s" criticized Artisan's service as "unfriendly" and shared that a purported rip in his carpet was "actually made [] worse" by Artisan's attempted repair. Ms. Kinda compared the reviews to Artisan's service records and did not find any jobs or customers that corresponded to the work described in the reviews. Ms. Kinda became suspicious that they were not legitimate after noting the three reviews were posted in the days immediately following issuance of the temporary restraining order.

Plaintiffs amended their complaint to add a cause of action for defamation as to Ms. Kinda and Artisan. They alleged that defendant, his company, and Does 1-10 "commenced a campaign of defamation" on or about June 1, 2011 against Ms. Kinda and Artisan "whereby they pretended to be customers of [p]laintiffs and published false statements online summarizing a fictional and disappointing experience with [p]laintiff's business." Citing Civil Code section 45a, Ms. Kinda and Artisan alleged that the statements were false and libelous on their face because the reviews subjected them to

4

"ridicule and obloquy" and sought to injure their reputation in the fine rug cleaning and care industry by imputing a lack of integrity, professionalism, and competence. Defendant denied the allegations against him and specifically denied any responsibility for the Yelp reviews.

Plaintiffs tried to discover the identity of the person or persons responsible for the Yelp reviews. Plaintiffs subpoenaed Yelp! Inc. for business records and obtained the email addresses and IP addresses[3] associated with the three reviews at issue. The "thomas j" and "Sandy Z" posts shared the same IP address, which was associated with an Internet account registered to Comcast Corporation (Comcast). The "chris s" post came from a different IP address associated with an AT&T Internet Services (AT&T) account.

Plaintiffs requested from Comcast and AT&T the subscriber information associated with the IP addresses at the time of the June 2011 Yelp posts. AT&T responded with the "IP Assignment Details" for the relevant time frame and IP address, as well as "Customer Account Details" for an inactive account that had been registered to "Scott D. Carpenter" and billed to an address in Santa Cruz, California. The address was the location of defendant's business offices at the time. Comcast eventually responded that due to its record retention system, it could not verify the IP address information for any date before July 27, 2011, but Comcast provided the subscriber information for the IP addresses as of that date. The subscriber listed was Scott Carpenter. The service address for the subscriber account was defendant's home address.

---

[3] An IP address (Internet Protocol Address) is a " 'unique identifier' " that functions " 'much like [a] Social Security number[] or telephone number[],' " each corresponding to " 'a specific entity connected to the Internet.' " (*Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 337 (*Kleffman*) [quoting *National A–1 Advertising, Inc. v. Network Solutions, Inc.* (D.N.H. 2000) 121 F.Supp.2d 156, 159 (*National A–1*)]; see also *U.S. v. Forrester* (9th Cir. 2008) 512 F.3d 500, 510, fn. 5 ["Every computer or server connected to the Internet has a unique IP address"].)

In connection with this information and possible punitive damages on their defamation claim, plaintiffs sought an order to allow pretrial discovery on defendant's financial condition.[4] The judge who heard the motion found the IP address evidence to be circumstantial yet compelling. The court referred to the evidence as a "series of coincidences" whereby "the negative reviews on Yelp were traced to the defendant's internet protocol addresses." The court explained: "[A]lthough the defendant makes an interesting argument that it's not conclusively shown that Mr. Carpenter himself provided these reviews ..., the circumstantial evidence in this case and the only reasonable interpretation that this Court comes to is that it is highly likely that the defendant is the one that is responsible for these reviews and it's not just a coincidence." The court granted the discovery motion but cautioned that any findings were "only for this motion for discovery" and were not to be viewed as binding on any trier of fact.

## C. MOTIONS IN LIMINE AND TRIAL

A different judge presided over pretrial motions and trial. Defendant moved in limine to exclude evidence of and reference to the Yelp posts on the grounds that the posts were inadmissible hearsay and unauthenticated. After hearing from counsel, the court dispensed with the hearsay argument and focused on what was termed authentication: "[Y]ou have to put on some sort of evidence that ties [the Yelp posts] to the defendant and authenticates it. [¶] … [¶] How are you going to tie it to the defendant, please?" Plaintiffs' counsel responded that the Yelp posts, memorialized as printouts of the online reviews, were "self-authenticating" under Evidence Code section 1552. To tie those reviews to defendant, plaintiffs would offer the subpoenaed

---

[4] Civil Code section 3295 authorizes a court to order pretrial discovery of a defendant's financial condition if "the plaintiff has established that there is a substantial probability" of prevailing on the claim. It expressly provides that the order "shall not be considered to be a determination on the merits of the claim or any defense thereto and shall not be given in evidence or referred to at the trial." (Civ. Code, § 3295, subd. (c).)

6

records from AT&T and Comcast, authenticated by the respective custodians of records. Plaintiffs' counsel argued that by using the subpoenaed records, they could show sufficient circumstantial evidence from which the jury could reasonably infer that defendant posted the reviews.

Defendant's counsel disagreed, arguing that the subpoenaed documents "indicate that the users who posted these IDs accessed the internet and the Yelp website using an IP address that was assigned to Scott Carpenter's routers, one at his home, one at his business," but that "there is absolutely no way of connecting the posts to a specific computer either in his home or his business or to a specific user." Defendant's counsel explained that "anyone on any computer within [defendant's] office would have the exact same IP address, no matter which computer was being used, as well as anybody who was using the computer at Mr. Carpenter's house at the time, anything posted is going to come back to the exact same IP address. … So you could have had a dozen employees all on the computer at the same time, one of whom may have posted this, but you can't identify who it is. Just the same as you can't say that somebody sat outside of his house and jumped on his internet connection, because they were unsecured."

Defendant's counsel urged it was insufficient to have merely the IP address of a router that was assigned to defendant's address, because "[w]hether that router was at his home at the time, whether or not, you know, a neighbor accessed it, whether or not, you know, somebody else was within distance … that's just what the circumstance[] was here. … [I]t does not come close to proving that it was Scott Carpenter himself [who] posted these reviews. And that's absolutely the first question that has to be answered in order to establish defamation."

The court stated that it would require expert testimony under Evidence Code section 402 before allowing the Yelp evidence at trial and that it would not entertain argument on circumstantial evidence without having its concerns about authenticity addressed. Plaintiffs lodged the deposition testimony of their expert, Ron Herardian, and

7

submitted supplemental briefing on the admissibility of the Yelp evidence. At the evidentiary hearing, the trial court remained skeptical that the evidence could tie the Yelp posts to defendant. The court noted the Comcast records only showed the relevant IP address assigned to Scott D. Carpenter as of July 27, 2011, more than one month after the Yelp reviews posted. The court rejected plaintiffs' assertion that Mr. Herardian's testimony could show the IP address assigned in late July 2011 was "more likely than not" the same as that assigned in June 2011.

The court identified a similar problem with the AT&T records showing Scott D. Carpenter's name and address in response to the subpoena requesting subscriber information linked to the IP address at issue. Based on the appearance of the AT&T record, which referenced defendant's name in one place on the document, and dates of service and billing address in another, the court rejected plaintiffs' argument that the expert could interpret the record to show defendant was the subscriber with the IP address in question on the relevant date. The trial court also rejected plaintiffs' argument that deposition testimony, in which defendant acknowledged that the email address associated with the AT&T account belonged to defendant's former employee whose email remained with the company after the employee left, remedied the foundational issues.

The trial court granted defendant's in limine motion, stating "I'm keeping out all of these Yelp allegations. I don't find that you've met the foundational requirements for these matters." It explained its reasoning as to the Comcast and AT&T records: "I'm not going to allow the Comcast records in. The custodian of records certifies them beginning July 27th, 2011, and we have no information before us about anything preceding that time. I do not agree that Mr. Herardian can make that leap. He certainly can explain things regarding access to routers and IP addresses and things like this, but the foundation still must be laid for the records. It could have been done, you just have the wrong witness, in this Court's opinion. ... So I'm not going to allow any reference to the Comcast IP address, and therefore those two reviews from that time. [¶] Now, with

8

respect to AT&T, I think there's the same foundation flaw. Your expert in his testimony said 'I assumed that the billing address is the same as the service address.' And I don't think one can assume such [an] important foundational fact. Looking at the deposition, Mr. Carpenter says, 'I used to have an employee of this name and she had an email, and she hasn't worked for me in years, and we have changed our system since then.' So I don't see that this deposition contains anything which surmounts the foundational gaps."

After trial began, the court granted defendant's request for a directed verdict on the defamation cause of action based on a failure of evidence. The remaining causes of action for breach of contract, breach of the implied covenant of quiet enjoyment, and breach of the covenant of good faith and fair dealing were tried to the jury as discussed in greater detail below. The jury unanimously found for defendant on all three contract-based causes of action. On the verdict form for breach of contract, the jury marked that defendant violated the lease ("d[id] something that the contract lease prohibited him from doing") as to each plaintiff, but found that no harm resulted.

### D. TRIAL OF THE CONTRACTUAL CAUSES OF ACTION

The evidence on the contract claims primarily consisted of plaintiff Margaret Kinda and defendant's respective testimonies regarding plaintiffs' tenancy and defendant's actions as landlord, both before and after Ms. Kinda obtained injunctive relief via court order pertaining to the construction noise and parking issues.

Ms. Kinda testified about a variety of incidents that imposed on her business and interfered with her ability to service clients, who "just come to our business and they don't call first" and who she feared would turn away. The incidents included a day of jackhammering,[5] which Ms. Kinda testified "was the loudest noise I had ever been exposed to. [¶]…[¶] I felt that my hearing was being damaged. I had two choices: [t]o

---

[5] The jackhammering lasted one business day and was completed over the weekend after Ms. Kinda complained and sought a restraining order.

sit there and endure it or close my business." They also included defendant's attempt to inspect and videotape plaintiffs' premises (ostensibly in order to evaluate the space for sound attenuation), defendant's service of multiple 15-day notices requiring plaintiffs to cure specified defaults (such as to obtain a permit for their rug drying racks, to install ventilation, to cease selling rugs from the premises)—or vacate, and defendant's alleged interference with plaintiffs' assigned parking and the loading zone later designated by the court. When pressed on cross-examination, however, Ms. Kinda was unable to articulate any quantifiable, monetary damages that resulted.

Ms. Kinda also testified—at times in response to questions from the jurors[6] and the court[7]—regarding her perceived lack of effort to resolve her complaints informally with defendant rather than resort to litigation.

Defendant, on the other hand, testified regarding his purchase of the property and initial interactions with Ms. Kinda, his response to her notice on the afternoon of the jackhammering that she would seek a temporary restraining order, his attempts to navigate parking and other issues at the building, and his reasons for serving the 15-day

[6] During trial, the jurors were permitted to submit questions for the witnesses, subject to the trial court's and counsel's review of the questions at sidebar before reading them to the witness.

[7] The trial court questioned Ms. Kinda during plaintiffs' case-in-chief, after Ms. Kinda stated that her reason for not communicating directly with defendant was because he was represented by counsel. "THE COURT: But you sent him emails over and over and over again after he was represented by counsel. Isn't that inconsistent with what you are now saying? [¶] THE WITNESS: What -- I drew a distinction between the day-to-day operation of the business and the legal issues in the case. … [¶] THE COURT: From the very first day you sent him an email saying you're going to court tomorrow. [¶] THE WITNESS: I didn't -- [¶] THE COURT: He didn't have a lawyer yet. [¶] THE WITNESS: I sent -- [¶] THE COURT: Let me finish my question. [¶] THE WITNESS: I'm sorry. [¶] THE COURT: Thank you. [¶] You could have made an effort to say 'Let's meet in person and talk this out.' He didn't have any attorney then, did he. [¶] THE WITNESS: I did that with his lawyer. If you -- there was an email that has not been introduced, but I did say to [counsel], 'Can we meet early at the courthouse before the hearing.' I most certainly did try to work it out."

10

notices. A juror asked why defendant decided to serve the 15-day notice pertaining to the drying rack "months after you had known about [the racks]? Example: You purchased the property in [December] 2010, took action in June 2011" Defendant responded that when he purchased the property, he had only limited access to see plaintiffs' space and assumed the tenants were in compliance with the lease, "and it wasn't until later" that he found out the drying racks were not code compliant. Another question reflected a juror's struggle to identify damages, which the trial court deemed appropriate to read to the jury from the bench, though the practice until that point was to pass juror questions to counsel conducting the direct examination. After reading the question, the court remarked, "That is a question indeed. We'll just have to keep listening carefully to the evidence to see if it's ever answered."[8]

### E. DETERMINATION OF PREVAILING PARTY AND ATTORNEY'S FEES AWARD

Following the defense verdict and entry of judgment, defendant moved for attorney's fees and costs as the prevailing party under the contract. After extensive briefing and argument over the course of two hearings, the trial court deemed defendant the prevailing party for all purposes. The court made several adjustments to defendant's total and denied defendant's request for a multiplier. The court awarded defendant a total of $219,086.00 in fees and costs.

## II.    DISCUSSION

Plaintiffs challenge the exclusion of the Yelp evidence on three grounds: 1) the basis for the ruling exceeded the grounds for relief stated in the motion; 2) the trial judge

---

[8] To be precise, the trial court received the jurors' questions and held an unreported bench conference with counsel, after which the court stated: "Ladies and gentlemen, there are a number of questions from our jurors. And [Counsel] will ask them on your behalf of Mr. Carpenter. [¶] I will share with you one question. 'I'm unsure what the judgment award will or might be.' That is a question indeed. We'll just have to keep listening carefully to the evidence to see if it's ever answered."

11

improperly reconsidered the previous ruling allowing financial discovery; and 3) the trial court applied the wrong standard in finding an absence of foundation for the records.

## A. THE TRIAL COURT DID NOT ERR IN RULING ON GROUNDS NOT STATED IN DEFENDANT'S MOTION IN LIMINE

Plaintiffs argue the trial court exceeded its jurisdiction when it ruled on defendant's motion based on grounds that were not stated in the moving papers. A basic tenet of motion practice is that the notice of motion must state the grounds for the order being sought (Code Civ. Proc., § 1010; Cal. Rules of Court, rule 3.1110(a)), and courts generally may consider only the grounds stated in the notice of motion. (*Luri v. Greenwald* (2003) 107 Cal.App.4th 1119, 1125 (*Luri*).) For example, in *People v. American Surety Ins. Co.* (1999) 75 Cal.App.4th 719, 726, the appellate court rejected the argument that a surety's motion to vacate forfeiture of bail bond provided sufficient notice of a request for an extension of the statutory period following forfeiture, because the notice of motion to vacate made no reference to an extension being sought or the grounds for that relief.

The purpose of the notice requirements "is to cause the moving party to 'sufficiently define the issues for the information and attention of the adverse party and the court.' " (*Luri*, *supra*, at p. 1125, quoting *Hernandez v. National Dairy Products* (1954) 126 Cal.App.2d 490, 493.) Sometimes this purpose is met notwithstanding deficient notice. For example, it may be sufficient that the supporting papers contain the grounds for the relief sought, even if the notice does not. (*Luri*, at p. 1125; *366-386 Geary St., L.P. v. Superior Court* (1990) 219 Cal.App.3d 1186, 1200.) It also may be sufficient if the omitted issue, or ground for relief, was raised without objection before the trial court. (*Fredrickson v. Superior Court* (1952) 38 Cal.2d 593, 598 ["accepting petitioner's claim that the notice of motion was insufficient, the grounds were raised without objection in the trial court at the hearing on the motion"].)

12

Defendant's motion referenced only hearsay and authenticity as grounds for excluding the Yelp posts. Although the trial court's inquiry extended beyond those grounds, plaintiffs never objected to the broadened scope, and they had ample opportunity to respond to the grounds raised by the trial court. Unlike *Luri*, where by omitting the specific statutory grounds for relief a motion risked depriving the opposing party of the opportunity to provide relevant information in response (*Luri*, *supra*, 107 Cal.App.4th at pp. 1125–1126), plaintiffs here fully developed their opposition to the court's broadened inquiry in their supplemental memorandum and offer of proof.

These circumstances also are distinguishable from a ruling on a motion in limine that deprives the nonmoving party of any opportunity to address issues that were raised outside of the notice and motion. (*Cf. Blanks v. Seyfarth Shaw LLP* (2009) 171 Cal.App.4th 336, 376 [trial court erred in ignoring the grounds presented in the motion in limine and ruling on the ultimate issue of negligence without giving "the parties an opportunity to address the facts required to assess" that ultimate issue].) We conclude plaintiffs had a fair opportunity to brief and present their evidence in response to the court's extensive inquiry.

## B. THE TRIAL COURT DID NOT IMPROPERLY RECONSIDER A PRIOR COURT RULING

Plaintiffs argue that the trial court's inquiry into the Yelp evidence improperly functioned as a reconsideration of the issues previously decided by a different judge in plaintiffs' motion for financial discovery. Code of Civil Procedure section 1008 places strict jurisdictional limits on a litigant's ability to seek reconsideration of a prior ruling. (Code of Civil Procedure § 1008, subd. (a) [application for reconsideration of prior, interim court order must be made within ten days of entry of the order and be based "upon new or different facts, circumstances, or law"].) Any application for reconsideration must comply with the provisions of section 1008 in order for the court to consider the request. (*Id.* § 1008, subd. (e).)

13

Plaintiffs rely on two cases. *Curtin v. Koskey* (1991) 231 Cal.App.3d 873 (*Curtin*) involved a judgment of dismissal for failure to prosecute, which the trial court granted only weeks after another judge in the same court granted the plaintiffs' request for preferential trial setting. The appellate court reversed, noting that "the considerations in a motion for preferential trial setting are the same as the considerations in a motion to dismiss," and depending on the basis for the first judge's ruling, the motion to dismiss actually should have been styled as a motion for reconsideration of the ruling on preferential trial setting. (*Id* at pp. 877–878.) The second case, *Morite of California v. Superior Court* (1993) 19 Cal.App.4th 485 (*Morite*), involved a writ proceeding concerning insurance coverage for individuals named as defendants in a related wrongful termination case. One judge stayed the insurance coverage action pending resolution of the related case. (*Id.* at pp. 488–489.) At a later status conference, a different judge set for trial certain causes of action in the coverage case. (*Id.* at p. 489.) The appellate court found that the second judge had "circumvented the jurisdictional limits of section 1008, subdivision (e) by consciously ignoring the stay order which had been entered by a predecessor judge of the same court" and entering an order that "does not specifically lift the stay … but, by implication, has the same [e]ffect." (*Morite, supra,* at p. 492.)

We do not find either case applicable here to the trial court's treatment of defendant's in limine motion relative to the earlier discovery ruling. In both *Curtin* and *Morite*, the later ruling imposed a course of action in direct conflict with the earlier ruling. In *Curtin*, the dismissal for failure to prosecute effectively overrode the granting of a preferential trial setting (*Curtin*, *supra*, at pp. 877–878); in *Morite*, the setting of trial conflicted with the earlier stay. (*Morite*, *supra*, at p. 492.) Plaintiffs fail to explain how the exclusion of the Yelp evidence effectuates a reconsideration, modification, or revocation of a prior order. (*See* Code of Civil Procedure § 1008.) The findings of the judge who granted financial discovery were expressly made "only for this motion for discovery" and carried no binding effect. That judge's observations about the

14

circumstantial evidence in relation to the defamation cause of action did not limit a later court's ability to rule on admissibility of the same evidence at trial.

## C. THE TRIAL COURT ERRED IN EXCLUDING THE YELP EVIDENCE

Plaintiffs argue that the trial court's exclusion of the Yelp evidence deprived them of the opportunity to present their defamation case to the jury, while defendant contends that plaintiffs effectively abandoned the defamation cause of action after the evidentiary ruling.

### 1. Standard of Review

Plaintiffs correctly state that if the trial court's ruling on a motion in limine precludes an entire cause of action, the ruling is subject to independent review on appeal as though the court had granted a motion for nonsuit. (*Dillingham-Ray Wilson v. City of Los Angeles* (2010) 182 Cal.App.4th 1396, 1402 (*Dillingham-Ray Wilson*); *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1595 (*Amtower*).) Under those circumstances, the appellate court "review[s] the court's order de novo, examining the record in the light most favorable to the party offering the evidence." (*City of Livermore v. Baca* (2012) 205 Cal.App.4th 1460, 1465.) That is, "all inferences and conflicts in the evidence must be viewed most favorably to the nonmoving party." (*Amtower*, at p. 1595.) Any significant error of law that prevented the nonmoving party from offering evidence to establish its case will warrant reversal. (*Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 677 [error that results in denial of a fair hearing is reversible per se].) A motion for directed verdict, as was granted here, is subject to the same standard of review on appeal as a motion for nonsuit. (*County of Kern v. Sparks* (2007) 149 Cal.App.4th 11, 16.) Both are " ' "in the nature of a demurrer to the evidence, and [are] governed by practically the same rules, and concede[] as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom." ' "

(*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210, quoting *Estate of Lances* (1932) 216 Cal. 397, 400–401.)

We are not persuaded by defendant's argument that exclusion of the Yelp evidence on foundational grounds did not preclude plaintiffs from offering evidence regarding the alleged defamation. The tort of defamation "requires the intentional publication of a false statement of fact that has a natural tendency to injure the plaintiff's reputation or that causes special damage." (*Burrill v. Nair* (2013) 217 Cal.App.4th 357, 383.) Here, the online reviews were the sole alleged source of defamation. Plaintiffs obtained, via subpoena, the IP addresses associated with the online posts, which information was authenticated by the Yelp!, Inc. custodian of records. An IP address standing alone, however, is nothing more than a string of " 'four sets of numbers separated by periods.' " (*Kleffman*, *supra*, 49 Cal.4th at p. 337, quoting *Kremen v. Cohen* (9th Cir. 2003) 325 F.3d 1035, 1038.) " 'IP addresses function much like Social Security numbers or telephone numbers: each IP address is unique and corresponds to a specific entity connected to the Internet.' " (*Kleffman*, at p. 337, quoting *National A–1*, *supra*, 121 F.Supp.2d at p. 159.) But that entity cannot be identified without corresponding information from the internet service provider responsible for assigning the IP address in question.

It is this corresponding information, the Comcast and AT&T records pertaining to the IP addresses, which was excluded and without which plaintiffs could not prove defamation. The trial court's statement following its ruling on the motion confirmed this: "I'm keeping out all of these Yelp allegations. I don't find that you've met the foundational requirements for these matters." Plaintiffs later asked the trial court to clarify the effect of the in limine ruling, and defendant urged he was entitled to a directed verdict on the defamation cause of action, which the trial court eventually granted.

These circumstances are analogous to cases in which the appellate court reviewed the exclusion of evidence on a motion in limine as it would a nonsuit. One such case is

16

*R&B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 332 (*R&B Auto Center*), in which a used car dealership sued several insurer defendants after they sold lemon law insurance to the dealership and later denied the coverage. The appellate court found the trial court had made "numerous erroneous rulings" on motions in limine, the effect of which "largely gutted the dealership's case." (*Id.* at pp. 332–333.) For example, one in limine motion expressly sought to exclude "any evidence pertaining" to an unfair competition cause of action, and another sought to exclude the testimony of witnesses who also had been sold unusable coverage. (*Id.* at pp. 356–358.) The appellate court determined that granting these motions had the effect of "excluding nearly all of the evidence that would have shown the alleged pattern and practice underlying the unfair competition claim." (*Id.* at pp. 327-328, 358.) Had the witnesses been allowed to testify, "a trier of fact potentially could find [the defendant] engaged in unfair business practices" such that the trial court could not say, resolving all inferences and doubts in favor of the plaintiff, that judgment on the unfair competition cause of action was required as a matter of law. (*Id.* at p. 359.)

Although the trial court's exclusion of the Yelp evidence on foundational grounds was narrower than the multiple, broad motions in limine granted in *R&B Auto Center*, the result here—a directed verdict on the defamation cause of action—had the same effect. (See *R&B Auto Center*, *supra*, at p. 332 [cautioning against "wholesale disposition" of a case or causes of action through rulings on motions in limine].) Also instructive is *Dillingham-Ray Wilson*, *supra*, 182 Cal.App.4th at p. 1401, in which the trial court ruled in limine to exclude the plaintiff from presenting its total cost claim of millions of dollars to the jury because its evidence on damages was insufficient and based on a theory not recognized in California. Applying independent review, the appellate court disagreed with the trial court's conclusions and remanded for trial on the excluded damages claims. (*Id.* at p. 1400; see also *City of Livermore v. Baca*, *supra*, 205 Cal.App.4th 1460 [trial

17

court erred in excluding all evidence of severance damages in eminent domain challenge, requiring reversal].)

Defendant cites *Katiuzhinsky v. Perry* (2007) 152 Cal.App.4th 1288 (*Katiuzhinsky*) to argue that an abuse of discretion standard should apply. *Katiuzhinsky*, however, involved an in limine ruling that erroneously limited the plaintiffs' damages evidence to certain, discounted medical expenses, rather than allowing the jury to consider all the available evidence of medical expenses. (*Id* at p. 1295.) As noted in *Dillingham-Ray Wilson*, abuse of discretion review is appropriate when, like in *Katiuzhinsky*, "an in limine ruling does not preclude an entire claim but instead limits the evidence that will be offered to prove a claim." (*Dillingham-Ray Wilson*, *supra*, at p. 1403.) The damages verdict in *Katiuzhinsky* was based on a partial presentation of the plaintiffs' medical bills, whereas here no evidence of Ms. Kinda and Artisan's defamation cause of action reached the jury. (*Katiuzhinsky*, *supra*, at p. 1291.)

We will independently review the granting of defendant's motion in limine, viewing the record in the light most favorable to plaintiffs and determining whether the evidence and inferences were sufficient to support a judgment in defendant's favor.

### 2. The Trial Court's Analysis of Defendant's Motion

Motions in limine are "designed to facilitate the management of a case, generally by deciding difficult evidentiary issues in advance of trial." (*Amtower*, *supra*, 158 Cal.App.4th 1582, 1593.) Their " ' "usual purpose … is to preclude the presentation of evidence deemed inadmissible and prejudicial by the moving party." ' " (*Ibid.*) As we have explained, the use of the in limine process to dispose of a case or cause of action for evidentiary reasons triggers a more rigorous standard of review in which we consider whether the nonmoving party has had a full and fair opportunity to state all the facts in its favor. (*Id.* at p. 1595.) All inferences and conflicts in the evidence must be resolved in favor of the nonmoving party. (*Ibid.*) "No matter how logical a moving party's motion

18

may sound, a judge generally should not be weighing the evidence on a motion in limine." (*R&B Auto Center*, *supra*, 140 Cal.App.4th 327, 333.)

The appellate court in *Amtower* examined the pitfalls that can result from "us[ing] the in limine process to examine the sufficiency of the evidence," including the loss of certain procedural protections provided by statutory motions or by trial on the merits. (*Amtower*, *supra*, at pp. 1593–1594.) The court distinguished this nontraditional, nonstatutory use of in limine motions from traditional in limine motions, noting "[t]he risk of reversal arises when appellate courts are required to review a dispositive ruling on an in limine motion as if it were the product of a motion for nonsuit after opening statement." (*Id.* at p. 1594.) Thus, in *Amtower*, which arose out of the merger of two companies, the court upheld the trial court's dismissal of the plaintiff's cause of action for a section 11 federal Securities Act violation on an in limine motion only after concluding, as a matter of law, that the plaintiff "could not have prevailed under any circumstances." (*Amtower,* at p. 1595.) The court reached this conclusion after reviewing the requirements of a section 11 claim and the plaintiff's concession that he had seen and read key disclosure statements—facts that "conclusively demonstrate[d] that plaintiff had actual knowledge" of material omissions in the defendant's filing, triggering the one-year statute of limitations. (*Amtower* at p. 1596.) Because the plaintiff did not file his complaint until "well over a year after he admittedly read all the pertinent documents," the court found that despite the disfavored use of a motion in limine to dispose of an entire cause of action, "the inescapable conclusion is that the section 11 claim was barred by the statute of limitations as a matter of law. There is no evidence that plaintiff could produce that would change this result. Accordingly, there was no issue for the jury to decide and the trial court properly dismissed the section 11 claim." (*Id.* at pp. 1596–1597.)

In contrast, plaintiffs here argue the trial court erred in analyzing the in limine motion by applying all possible inferences *against* plaintiffs as the nonmoving party, in

effect circumventing the procedural protections that should have applied. (See *Amtower*, *supra*, at p. 1594.) The issue presented to the trial court was the question of authenticity of the Comcast and AT&T records; the issue ultimately decided by the court was the sufficiency of evidence implicating defendant. The trial court failed to apply the appropriate standard, even as it considered the motion to be dispositive of the defamation cause of action.

Defendant's motion argued the Yelp posts, offered as webpage printouts, were "not authenticated" and plaintiffs had not identified a custodian from Yelp's records department to authenticate the documents. Plaintiffs responded that the Yelp web posts could be authenticated under Evidence Code section 1552, by which a printed representation of computer generated information is presumed to be an accurate representation of that information at the time it was printed. Plaintiffs' offer of proof also stated that Ms. Kinda and another individual would testify to having seen the reviews online.

Our Supreme Court has explained that "[a]uthentication is to be determined by the trial court as a preliminary fact [Evid. Code, § 403, subd. (a)(3)] and is statutorily defined as 'the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' or 'the establishment of such facts by any other means provided by law' [§ 1400]." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*).) "Authentication is essentially a subset of relevance." (*Id.* at p. 267.) The proof necessary for authentication depends on "the purpose for which the evidence is being offered" and requires a foundation of "sufficient evidence for a trier of fact to find that the writing is what it purports to be." (*Ibid.*) Critical to our analysis is the general admonition that " '[a]s long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' " (*Ibid.* [quoting *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 312].) Thus, in *Goldsmith*, the court

concluded that the presumptions of authenticity under Evidence Code sections 1552 and 1553 "partly, but not completely, supply the foundation for admission of" evidence generated by an automated traffic enforcement system.  (*Id.* at p. 268.)

California courts have applied these authentication principles before and after *Goldsmith* to evidence from online and social media sources.  For example, under Evidence Code section 1552, a printout of a purported gang roster was "presumed to be an accurate representation of the web page" that a witness testified to seeing and printing off of the Internet.  (*People v. Beckley* (2010) 185 Cal.App.4th 509, 517.)  But the presumption did not extend to authenticate the *content*, which the court found required independent evidence of reliability and was inadmissible as evidence of gang membership.  (*Id.* at pp. 517–518.)  In *People v. Valdez* (2011) 201 Cal.App.4th 1429, the court rejected the defendant's authentication challenge to the prosecution's introduction of a "MySpace social media Internet page," which the prosecution's gang expert had relied on.  (*Id.* at p. 1431.)  The court reasoned:  "Although Valdez was free to argue otherwise to the jury, a reasonable trier of fact could conclude from the posting of personal photographs, communications, and other details that the MySpace page belonged to him.  Accordingly, the trial court did not err in admitting the page for the jury to determine whether he authored it."  (*Id.* at p. 1435.)  The court emphasized that "the proponent's threshold authentication burden for admissibility is *not* to establish validity or negate falsity in a categorical fashion, but rather to make a showing on which the trier of fact reasonably could conclude the proffered writing is authentic."  (*Id.* at p. 1437.)  Similarly in *In re K.B.* (2015) 238 Cal.App.4th 989, 997, the court found incriminating photographs from a cell phone, including website screenshots, were sufficiently authenticated, noting the "ultimate determination of the authenticity … is for

21

the trier of fact, who must consider any rebuttal evidence and balance it against the authenticating evidence in order to arrive at a final determination … ."[9]

Here, the trial court rejected Evidence Code section 1552 and plaintiffs' proffer as a basis for authenticating the Yelp reviews, explaining its concern was not whether the Yelp posts could be authenticated under section 1552 as writings that existed on the Internet under an alias, but whether the evidence would be sufficient to prove Ms. Kinda and Artisan's defamation claim. To this end, the trial court queried: "[B]efore it comes into evidence, you have to give me some connection that you can prove he posted them. If you can't do that, I'm not going to let it into evidence and we don't even have to have this discussion. [¶] [Plaintiffs' counsel:] Well, it's an issue of fact, Your Honor, and I think I can show that there's sufficient connect the dots -- I mean what are the odds that somebody decided to drive over to his house, park in front of his house, and as the expert testified -- [¶] [THE COURT:] If you don't choose to call the expert in a 402, then you're not getting any of this in. [¶] [Plaintiffs' counsel:] No, I can bring an expert in. I'm just -- [¶] [THE COURT:] Yeah, you're going to have to. You need to understand that I am concerned about the authenticity of this, if that's the correct word. You have to

---

[9] Courts in other jurisdictions have drawn similar conclusions. The Delaware Supreme Court in *Parker v. State* (Del. 2014) 85 A.3d 682 addressed the authentication and admissibility of social media evidence, specifically Facebook posts. After surveying decisions in several states, the court concluded that a proponent seeking to introduce social media evidence "may use any form of verification available under [the Delaware Rules of Evidence]—including witness testimony, corroborative circumstances, distinctive characteristics, or descriptions and explanations of the technical process or system that generated the evidence in question—to authenticate a social media post," at which point "the trial judge as the gatekeeper of evidence may admit the social media post when there is evidence 'sufficient to support a finding' by a reasonable juror that the proffered evidence is what its proponent claims it to be." (*Id.* at pp. 687–688) Ultimately, "the jury will then decide whether to accept or reject the evidence." (*Id.* at p. 688.)

tie it back to him.  And unless somebody persuades me that there is sufficient evidence that ties it back to him, then it's not going to come in."

This colloquy illustrates the trial court's treatment of the motion in limine like a motion for nonsuit, rather than limiting its assessment to the initial question of whether the documents were sufficient for the "trier of fact to find that the writing is what it purports to be."  (*Goldsmith*, *supra*, 59 Cal.4th at p. 266.)  " 'A motion for nonsuit is a procedural device which allows a defendant to challenge the sufficiency of plaintiff's evidence to submit the case to the jury.  [Citation.]  Because a grant of the motion serves to take a case from the jury's consideration, courts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper.  The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor.' " (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 747 [quoting *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117–118].)

Such use of the in limine proceeding is within the trial court's " 'inherent power to control litigation and conserve judicial resources.' "  (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 951–952 [citing use of motions in limine as "the functional equivalent" of dispositive orders at various stages of litigation]; *Amtower*, *supra*, 158 Cal.App.4th 1582, 1595 ["In spite of the obvious drawbacks to the use of in limine motions to dispose of a claim, trial courts do have the inherent power to use them in this way"].)  However, when used to foreclose a cause of action, the court must apply the restrictive standard of a nonsuit, interpreting the evidence most favorably to plaintiffs' case and resolving all presumptions, inferences and doubts in favor of plaintiffs. (*Ibid.*)  The trial court here took the opposite approach.

### 3.  The Trial Court Improperly Resolved Inferences Against Plaintiff

The Evidence Code defines inference as "a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise

23

established in the action." (Evid. Code, § 600(b).) An inference is "not evidence but rather the result of reasoning from evidence....'It must be such that a rational, well-constructed mind can reasonably draw from it the conclusion that the fact exists[.]' " (*Fashion 21 v. Coalition for Humane Immigrant Rights of Los Angeles* (2004) 117 Cal.App.4th 1138, 1149 (*Fashion 21*) [quoting *Wigodsky v. Southern Pacific Co.* (1969) 270 Cal.App.2d 51, 55].) The record reflects several instances in which the trial court resolved doubts about the evidence against plaintiffs and allowed adverse inferences to control its findings as to foundation. This translated into an improper weighing of the evidence, a task that should have been left to the jury as trier of fact. (*People v. Goldsmith*, *supra*, 59 Cal.4th 258, 267 [conflicting inferences in evidence go to the document's weight, not its admissibility]; *Spolter v. Four-Wheel Brake Service Co.* (1950) 99 Cal.App.2d 690, 693 [which of two conflicting inferences shall reasonably be drawn from the evidence "is entirely a jury question"].)

Here, for example, the trial court appears to have disregarded defendant's counsel's statements at the motion hearing, which effectively conceded that the records subpoenaed from Yelp, Comcast, and AT&T tied the Yelp posts to defendant's home and business network or routers. Defendant's counsel at various points stated that "[t]he documents that were subpoenaed indicate that the users who posted these IDs accessed the [I]nternet and the Yelp website using an IP address that was assigned to Scott Carpenter's routers, one at his home, one at his business…" and "[w]hether that router was at his home at the time, whether or not, you know, a neighbor accessed it, whether or not, you know, somebody else was within distance … that's just what the circumstance[] was here. Somebody was able to access his network[.]" Defendant's counsel thus did not dispute the connection between the IP addresses and defendant's home and business accounts, but only whether Mr. Carpenter himself could be shown to have posted the reviews.

24

Later in addressing the temporal gap between the Yelp reviews and the earliest IP address that Comcast could produce, the trial court negatively inferred that because the Comcast record did not extend to the dates of the postings, plaintiffs could not prove by a preponderance of the evidence that the reviews were in fact posted from defendant's Comcast account.[10] This conclusion ignored the positive inference that should have been drawn for plaintiffs from the fact that as of late July 2011, the Comcast record for the identical IP address provided by Yelp was assigned to defendant's account. Properly interpreting the evidence favorably to plaintiffs, out of the universe of IP addresses that could have been assigned to defendant by Comcast as of July 27, 2011, the one assigned to his account had been used to post two of the Yelp reviews less than two months earlier. Mr. Herardian's testimony supported this inference because it explained that a "sticky" IP address like that issued by Comcast continues to renew unless some intervening event of several days causes a new IP address to issue.

The trial court similarly resolved doubts about the AT&T record against plaintiffs and excluded the evidence for lack of foundation. The examination of plaintiffs' expert reveals the trial court's inferences regarding the AT&T evidence: "[Plaintiffs' counsel:] During the month of June 2011, who was that [IP address] account assigned to, according to this record from AT&T? [¶] [Mr. Herardian:] Scott D. Carpenter. [¶] [Plaintiffs' counsel:] Okay. Now, if you look at the top of that record -- [¶] [THE COURT:] How do you tell that? [¶] [Mr. Herardian:] His name is right here under 'Customer Name.' [¶] [THE COURT:] Right. And that says 'Billing Start Date: April 2001.' [¶] [Mr. Herardian:] That would be most likely the time at which the service was

---

[10] We have found no suggestion by the court or the parties that the Comcast record itself, as certified by the custodian of records, was inadmissible. Nor was there any suggestion that the document's provision of defendant's name and home address as the subscriber to whom the IP address in question was assigned as of July 27, 2011 was ambiguous or not responsive to plaintiffs' subpoena.

25

established.  [¶]  [THE COURT:]  How do you know that this is the record for June 3, 2011?  Because someone told you it was; right?  [¶]  [Mr. Herardian:] For June 3rd, 2011?  [¶]  [THE COURT:]  Yes.  [¶]  [Mr. Herardian:]  It's my understanding this document was provided in response to a subpoena.  [THE COURT:]  Right.  [¶]  So somebody told you that, that's the only reason you know that; is that fair?  [¶] [Mr. Herardian:]  It's fair to assume that it's because that was the information asked for in the subpoena, yes.  [¶]  [THE COURT:]  Okay.  Somebody told you that.  [¶]  So he doesn't know that.  Walk me through how you can tell that from this, [Plaintiffs' counsel].  [¶]  [Plaintiffs' counsel:]  Because they're responding to our subpoena and they're showing us who was assigned that IP address on that date.  That's what we asked them for.  And if you look at the top of that page, it shows you that Scott Carpenter was assigned that IP address from February 6th, 2011, to at least August 26th, 2011.  [¶] [Defendant's counsel:]  I'm going to object to the characterization that it was assigned. My reading of this document shows that his billing address is listed there.  I'm not sure that the document says what counsel purports it to say.  [¶]  [THE COURT:]  Yes.  [¶] And in this gentleman's deposition, he said he just assumed that the billing address and the service address were the same, as I recall.  Yes.  He is just assuming they're the same."

The trial court's scrutiny of whether the AT&T record indicated defendant on the account to which the IP address was assigned is perplexing because, on its face, the AT&T record contains enough information for a jury to reasonably infer defendant was the account holder, and defendant's counsel had already conceded the AT&T record linked the third Yelp post to defendant's office router or network.  The record itself provides two sets of information:  The "IP Assignment Details" show the IP address, provided by Yelp, assigned to the username "eviek@sbcglobal.net" for the date range February 6th, 2011 to August 26th, 2011.  The "Customer Account Details" show Scott D. Carpenter's name and account information, including billing dates, billing address,

26

and the "Member ID" for the account: eviek@sbcglobal.net. The underlying record established the address listed was defendant's business address and the "eviek" member ID and email address had been assigned to one of defendant's employees and had remained in effect when the employee left the company.

Defendant's counsel also conceded the connection, albeit in the context of arguing the insufficiency of the evidence: "[A]nyone on any computer within [defendant's] office would have the exact same IP address, no matter which computer was being used. … So you could have had a dozen employees all on the computer at the same time, one of whom may have posted this, but you can't identify who it is." Plaintiffs' counsel also made an offer of proof, stating "in case there's any issue about the fact that these accounts actually belonged to Mr. Carpenter, he acknowledged at his deposition that … the AT&T account is his account."

In light of these foundational facts, the inference that the billing address and physical location were the same is equally if not more plausible than the inference that they were different. Although not binding on the trier of fact, the rationale for granting the discovery motion earlier in the case, based on the court's "reasonable interpretation" of the circumstantial evidence, provides an example of how the issue could be, and in fact was, resolved in plaintiffs' favor.

There is no indication that the trial court found the AT&T record was not authentic or did not respond to the subpoena. The record was, therefore, admissible, and any dubious or conflicting inferences to be drawn would " 'go[] to the document's weight as evidence, not its admissibility.' " (*Goldsmith*, *supra*, 59 Cal.4th 258, 267.) Given the dispositive effect of the motion, the trial court erred by failing to draw these inferences in plaintiffs' favor in ruling on the motion. (*See R&B Auto Center*, *supra*, 140 Cal.App.4th at p. 358 [application of presumptions and inferences led to conclusion that trier of fact "potentially could find that [the defendant] engaged in unfair business practices"]; *Dillingham-Ray Wilson*, *supra*, 182 Cal.App.4th at p. 1403.)

#### 4. The Directed Verdict Was Improper

Plaintiffs cite *Fashion 21*, *supra*, 117 Cal.App.4th 1138, for the proposition that the publication element of defamation may be proven with indirect evidence. In *Fashion 21*, a clothing retailer brought a claim for libel against a group of workers who allegedly distributed defamatory flyers during a demonstration. (*Id.* at pp. 1143–1144.) The defendants moved to strike the complaint as a SLAPP suit under Code of Civil Procedure section 425.16, subdivision (b)(1).[11] (*Fashion 21*, at p. 1143.) The plaintiff's evidence to establish publication by one defendant "Narro" was an edited videotape of the demonstration, which showed Narro arriving at the scene of the demonstration with the demonstrators, unloading placards and a banner, and holding a stack of flyers, while passersby held and sometimes read the flyers. (*Id.* at p.1149.) The defendants argued this evidence was insufficient to go to the jury "because it would be pure conjecture to say the flyers were distributed by Narro when they just as well could have been distributed by the other person or by persons not even shown on the videotape." (*Ibid.*)

The appellate court found the circumstantial evidence sufficient for the jury to infer the fact of publication. The court explained: "Even 'slight evidence' in support of the fact to be inferred has been held to be sufficient. It is up to the jury to assess these credibility and judge the weight of the evidence proffered in support of and in opposition to the fact it is asked to infer. [¶] We believe the evidence showing Narro actively participated in the demonstration, had a stack of the green flyers in his possession and the flyers wound up in the hands of those passing by could, but not necessarily would, lead a reasonable trier of fact to infer Narro distributed at least some of the flyers." (*Fashion 21*, at pp. 1149–1150.) The appellate court rejected the notion that a jury is permitted to

---

[11] The *Fashion 21* appeal followed the defendants' unsuccessful SLAPP motion to strike the complaint, which had required the lower court to decide whether Fashion 21 had established a probability that it would prevail on its causes of action. (*Fashion 21*, *supra*, at p. 1144.)

draw an inference only when the evidence is so strong that the inference must be found as a matter of law. (*Id.* at p. 1150.)

We are persuaded by the appellate court's reasoning in *Fashion 21* and apply it here. The sum of indirect evidence contained in the record and provided in plaintiffs' offer of proof regarding the Yelp reviews includes: 1) the date and fact of the issuance of the June 1, 2011 temporary restraining order; 2) the Yelp reviews posted on June 1, June 2, and June 3, 2011; 3) Ms. Kinda's testimony regarding her efforts to verify the jobs described and determine which customers, if any, posted the reviews; 4) the subpoenas served on Yelp, Comcast, and AT&T, and the responsive records; and 5) Mr. Herardian's expert testimony regarding IP addresses, their relation to a physical entity (*i.e.*, router or network) through assignment by an Internet Service Provider, the technical attributes of wireless networks, and the requirements to log on to an unsecure network.

As in *Fashion 21*, we find that this evidence "could, but not necessarily would" lead a reasonable trier of fact to infer that defendant posted the Yelp reviews. (*Fashion 21*, *supra*, at p. 1150.) This evidence includes the Yelp, Comcast, and AT&T records, as well as defendant's anticipated testimony denying responsibility for the Yelp reviews. It is "up to the jury to assess the credibility and judge the weight of the evidence proffered in support of and in opposition to the fact it is asked to infer." (*Ibid.*) And it is for the jury, not the trial court, to determine the significance of the gaps in direct evidence, including the temporal gap in the Comcast records, any uncertainty in the physical versus billing addresses for the AT&T records, and the fact that IP addresses connect to a network or router rather than to a specific person or device. Viewing the evidence in the context of a directed verdict — which is to apply the same standard as a nonsuit — and resolving all inferences and doubts in favor of plaintiffs, we cannot say that judgment

29

against Ms. Kinda and Artisan on the defamation cause of action was required as a matter of law.[12]

In concluding that the trial court erred in its wholesale exclusion of the Yelp evidence and related Comcast and AT&T records, we do not intend to suggest that the trial court should abandon its gatekeeping function to allow or exclude evidence. The admissibility of each component of plaintiffs' evidence, including the scope of Mr. Herardian's expert testimony, was properly before the court and would have remained subject to the normal course of objections at trial.

### D. EXCLUSION OF THE YELP EVIDENCE CREATED A REASONABLE PROBABILITY OF PREJUDICE IN THE OUTCOME OF THE BREACH OF CONTRACT CAUSES OF ACTION

Having concluded that it was for the jury to draw any reasonable inferences from the range of circumstantial evidence pertaining to the Yelp reviews, and to weigh the significance, if any, of that evidence, we cannot ignore the possible consequences of a defamation trial for the contract-based causes of action. Defendants contend that even if exclusion of the Yelp evidence were found to be error, Plaintiffs have made no showing that the decision on the remaining contract claims should be reversed. But we find the evidentiary, and particularly credibility, issues are inextricably interrelated.

Plaintiffs contend that if Ms. Kinda and Artisan had prevailed on their defamation claim, they would have received at least nominal, presumed damages under Civil Code section 45a, which would have changed the jury's finding that there was no harm as a result of defendant's breach of contract. We disagree that a finding of presumed damages would be properly construed as contract damages. In the complaint, plaintiffs pleaded

---

[12] We note that this ruling applies only to plaintiffs Margaret Kinda and Artisan. The operative complaint alleged defamation only as to Ms. Kinda and Artisan; plaintiff Aaron Kinda was not a party to that cause of action. The exclusion of evidence in support of Ms. Kinda's and Artisan's defamation allegations cannot be said to have prejudiced Aaron Kinda in the same manner, if at all.

defamation and breach of contract allegations based on different facts. The cause of action for breach of contract comprised allegations that defendant failed to properly maintain the premises, made unreasonable demands to enter plaintiffs' business premises, interfered with business operations by running loud construction equipment, and interfered with plaintiffs' business by posting no parking signs, bothering customers, and serving multiple and defective legal notices on plaintiffs. The defamation cause of action comprised allegations that defendant pretended to be Artisan's customers and published false statements online about fictional experience with the business, with the intent to injure plaintiffs' business interest and deter future clients. The alleged bases for breach of contract do not encompass the alleged defamatory reviews on Yelp. Plaintiffs, in fact, specifically denied this possibility in response to the attorney's fees motion, arguing "[t]he tort claim was never plead or asserted as a breach of the lease or arising out of the lease." Plaintiffs reiterated this point in their objections to the proposed order regarding attorney's fees, arguing it was "factually erroneous" to consider the alleged defamation as part of the breach of contract, and that defendant had confused "basic civil pleading conventions, i.e.[,] incorporating prior allegations so as not to have to repeat them throughout" the complaint, with "actually having pled the tortious conduct as a breach of the lease."[13] For these reasons, we reject plaintiffs' contention that a finding of defamation per se under Civil Code section 45a would operate, de facto, as damages for the breach of contract.

This does not end our inquiry, however, because presentation of plaintiffs' defamation case likely would have affected the jury's view of the evidence on the breach

---

[13] We note that the trial court's order deeming defendant the prevailing party for all purposes, including the tort cause of action, came to the opposite conclusion. This does not affect our conclusion because in that analysis the trial court primarily relied on its interpretation of the attorney's fees clause in deciding not to apportion fees between tort and contract based causes of action.

of contract claims, so much so that we find it " 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 557; see *People v. Watson* (1956) 46 Cal.2d 818, 836; Cal. Const., art. VI, § 13.) " '[A] "probability" in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 (*Cassim*); *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) In determining whether errors in a civil trial require reversal, "we examine 'each individual case to determine whether prejudice actually occurred in light of the entire record.' " (*Cassim*, at pp. 801–802; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.)

On the record here, we note the centrality of defendant's actions, intentions, and credibility to plaintiffs' claims in both the tort and contract arenas. Defendant's motivation for certain actions against plaintiff was at issue in the proceeding on the contractual causes of action, as evidenced by plaintiffs' cross-examination and several juror questions. For example, the juror who asked why defendant acted in response to the unpermitted drying racks and began to issue his 15-day notices only in June 2011 very possibly would have perceived defendant's response differently, if the juror knew about the negative Yelp reviews, which also posted in June 2011. Although defendant had denied any involvement in or knowledge of the Yelp posts, the jury might have inferred otherwise from the evidence that appeared, at least circumstantially, to link defendant's Internet Service Provider work and home accounts to the three Yelp reviews. Defendant's credibility inevitably would have been affected by the defamation action. Whether and to what extent the defamation evidence would have impacted the jury's interpretation of the evidence adduced at the contract phase of the trial should not be left to mere speculation, as would be the case if only the defamation cause of action were to be reversed.

This is particularly true in light of the trial court's remarks, in the presence of the jury, that appeared to indicate that plaintiffs' case lacked merit because Ms. Kinda should have tried to resolve her problems before filing suit and because damages had not been proven.[14]  The trial court later instructed the jury that it should "not guess what I think your verdict should be from anything I may have said or done."  Even assuming, as we must, "the ameliorating effect of the trial court's instructions to the jury" (*Cassim*, *supra*, at p. 803 ["[a]bsent some contrary indication in the record, we presume the jury follows its instructions"]), we nonetheless find that these remarks—viewed alongside the erroneous exclusion of the defamation evidence—deprived plaintiffs of the reasonable probability of a more favorable result.  Accordingly, the judgment must be reversed.

### E. PREVAILING PARTY AND ATTORNEY'S FEES

Plaintiffs contend that the award of attorney's fees must be reversed due to the erroneous exclusion of the defamation evidence and resulting directed verdict.  We agree, though not on the grounds urged by plaintiffs.

Plaintiffs argue that their inability to present evidence of defamation deprived them of a finding of presumed damages under Civil Code section 45a, under the theory that had plaintiffs been allowed to prove defamation, the jury could not have concluded that they suffered no damages in connection with defendant's breach of the lease.[15]  Plaintiffs also argue that under these circumstances, given entitlement to damages per se, they may have been deemed the prevailing party in the action and entitled to attorney's

---

[14] See footnotes 7 and 8, *ante*, pages 10 and 11.

[15] Under Civil Code section 45a, libel may be shown to be "libel on its face," for which the plaintiffs need not allege and prove special damages. Plaintiffs contend they are likely to prove libel on its face as a result of defendant's alleged publication of the Yelp reviews, such that injury to Ms. Kinda's and Artisan's reputations will be conclusively presumed. (See California Civil Jury Instructions 1704.)

fees under the lease agreement.[16] Finally, plaintiffs argue the trial court's refusal to allow cross-examination of witnesses concerning defendant's attorney's fees request was an abuse of discretion.

Because we conclude that plaintiffs Margaret Kinda and Artisan should have been allowed to try their defamation cause of action, and we find it reasonably probable that the erroneous exclusion of that evidence affected the jury's assessment of the evidence and defendant's credibility as to the contract-based causes of action, the judgment must be reversed along with the trial court's prevailing party determination and award of attorney's fees and costs.[17]

On the issue of the prevailing party, the trial court rejected plaintiffs' argument that attorney's fees were only available on the contract related causes of action. Relying on *Santisas v. Goodin* (1998) 17 Cal.4th 599 and similar cases, the trial court examined the attorney's fees provision in the lease agreement and concluded the language was broad enough to encompass the defamation cause of action as well as the breach of contract allegations. Plaintiffs have not appealed that determination.

We reject plaintiffs' argument that the trial court abused its discretion in refusing to allow discovery and an evidentiary hearing in connection with the motion for attorney's fees and costs. While plaintiffs are correct that limited discovery concerning a fee request is permissible in appropriate circumstances, plaintiffs have not shown that such circumstances exist here.

---

[16] The pertinent provision of the lease agreement states: "In the event legal proceedings by either party hereto are necessary by reason of the breach of any covenant or condition hereof or arising out of this lease, then and in that event the prevailing party shall be entitled to have and recover of and from the other reasonable attorneys' fees and costs of such proceedings."

[17] We credit the trial court for its detailed review of the attorney's fees issue, including the parties' legal arguments, the motion to fix costs and opposing motion to tax costs, and the hundreds of pages of billing statements (some partially redacted), for work by two separate law firms, submitted in support of the motion.

34

Plaintiffs rely on *Oak Grove School Dist. v. City Title Ins. Co.* (1963) 217 Cal.App.2d 678 (*Oak Grove*), wherein the appellate court reversed an order quashing service of deposition notices after entry of judgment but before the motion to tax costs hearing. In *Oak Grove*, the plaintiff abandoned its eminent domain action after a verdict in the defendant's favor. (*Id.* at pp. 689–690.) The depositions were directed at the property owner and attorneys of record and sought information about the issues of abandonment and attorney's fees. (*Id.* at pp. 709, 711.) The trial court reasoned that the plaintiff was not entitled to take depositions after judgment or incident to a motion to tax costs; but the appellate court found this to be an abuse of discretion, noting the eminent domain proceedings were still pending, the notice of deposition was timely under the discovery statute, and as a matter of law the defendants were not prohibited from taking depositions after the judgment of abandonment. (*Id.* at pp. 710–712.) Another case cited by plaintiffs, like *Oak Grove,* involved abandonment of eminent domain proceedings by the state, and a problematic allegation, which arose for the first time in the defendant's memorandum of costs, that the state had incurred "delay damages" in addition to the statutorily prescribed litigation expenses. (*State of California v. Meyer* (1985) 174 Cal.App.3d 1061, 1069–1070.)

These eminent domain cases do not represent the usual course of determining attorney's fees under Civil Code section 1717, which governs the fee award pursuant to the lease agreement in this matter and provides that reasonable attorney's fees are to be fixed by the court. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1094.) Nor have plaintiffs explained their applicability here. Absent a greater showing of the need for discovery regarding the billing statements, we cannot say that the trial court's decision was outside "the permissible range of options set by the legal criteria." (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831.) Plaintiffs have not shown, for example, that they were deprived of critical information pertaining to the attorneys' bills. (See, e.g., *Riverside Sheriff's Assn. v.*

35

*County of Riverside* (2007) 152 Cal.App.4th 414, 425 [denial of request to depose opposing counsel regarding fees not an abuse of discretion where "County has not shown it was deprived of critical information; it was provided with the attorneys' billings"].)  As our Supreme Court has explained:  " 'The "experienced trial judge is the best judge of the value of professional services rendered" ' " and the determination will not be disturbed on appeal unless it is clearly wrong.  (*PLCM Group, Inc. v. Drexler, supra*, at p. 1095 [quoting *Serrano v. Priest* (1977) 20 Cal.3d 25, 49].)  In setting the amount of an attorney's fees award, the trial court need not " 'become enmeshed in a meticulous analysis of every detailed facet of the professional representation.  It ... is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps dwarfing the case in chief.' "  (*PLCM Group, Inc. v. Drexler*, *supra*, at p. 1098 [quoting *Serrano v. Unruh* (1982) 32 Cal.3d 621, 642].)

The trial court in this case conducted a detailed review of the declarations and, by its own description, "every single blooming page" of the billing records.  In its order awarding attorney's fees and costs, the court discussed the fees charged by both of defendant's law firms and found the fees per hour for both firms to be reasonable.  As to the hours claimed by one of defendant's law firms, the court noted plaintiffs' objections, disallowed certain entries, and adjusted the total number of hours claimed.  We find that the trial court fairly exercised its discretion in rejecting plaintiffs' requests for cross-examination of attorney witnesses in relation to the fee requests and properly carried out the lodestar calculation.

### III.   DISPOSITION

The judgment is reversed.  Each side shall bear its own costs on appeal.

_____

Grover, J.

**WE CONCUR:**

_____

Rushing, P.J.

_____

Márquez, J.

*Margaret L. Kinda et al. v Scott Carpenter*
**H040316**

| | |
|---|---|
| Trial Court: | Santa Cruz County Superior Court<br>Superior Court No. CV-171252 |
| Trial Judge: | Hon. Ariadne J. Symons |
| Counsel for Plaintiffs/Appellants<br>Margaret L. Kinda<br>Aaron Kinda<br>Artisan Fine Oriental Rug Care, Inc. | John Alan Schlaff<br>The Law Offices of John A. Schlaff |
| Counsel for Defendant/Respondent<br>Scott Carpenter. | Edmund Gerard Farrell<br>Murchison and Cumming, LLP |

*Margaret L. Kinda et al. v Scott Carpenter*
**H040316**