Filed 11/3/25  City of Morgan Hill v. Garcia CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CITY OF MORGAN HILL,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>W. ROCKE GARCIA et al.,<br><br>    Defendants and Appellants. | H052498<br>(Santa Clara County<br> Super. Ct. No. 21CV385524)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT]** |

THE COURT:

It is ordered that the opinion filed on October 21, 2025, be modified as follows:

On page 18, in the last paragraph, second sentence, change the statutory citation that reads "Subdivision (a) of section 1263.300" to "Subdivision (a) of section 1263.330."  Also on page 18, in the last paragraph, final sentence, change the statutory citation within the quoted passage that reads "the date of probable inclusion in a project is important in applying subdivision (a) of section 1236.330" to "the date of probable inclusion in a project is important in applying subdivision (a) of section 1263.330."

There is no change in the judgment.  The petition for rehearing is denied.

Dated: _____                  _____
                                        Danner, Acting P. J.


                                        _____
                                        Lie, J.


                                        _____
                                        Bromberg, J.


**H052498**
*City of Morgan Hill v. Garcia et al.*


2

Filed 10/21/25  City of Morgan Hill v. Garcia CA6 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CITY OF MORGAN HILL,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>W. ROCKE GARCIA et al.,<br><br>    Defendants and Appellants. | H052498<br>(Santa Clara County<br>Super. Ct. No. 21CV385524) |

This case involves the City of Morgan Hill's (City) condemnation action over an undeveloped, 4.088-acre parcel of land (the property) owned by W. Rocke Garcia and Glenda Garcia (together, defendants[1]).  The City filed the action to acquire the property for purposes of a regional road extension.

At issue is the amount of just compensation owed to defendants for the property.  The parties' expert appraisals diverged significantly.  The City's valuation of $3.74 million assumed a fair market value based on comparable undeveloped and unentitled land.  Defendants' valuation of $8.01 million assumed that, but for the road extension project, there was a reasonable

---

[1] For ease of reference, we refer to W. Rocke Garcia and Glenda Garcia together as "defendants."  We use "Garcia" to refer to W. Rocke Garcia individually.

probability that defendants would have obtained entitlements to develop the property as of the date of valuation. Defendants thus assumed a fair market value based on comparable land *with* land use entitlements.

Prior to trial, the trial court granted the City's Code of Civil Procedure[2] section 1260.040 motion to resolve legal issues affecting the determination of compensation. The court's ruling precluded defendants from introducing at trial evidence to support their theory of valuation and resulting appraisal analysis. Faced with the inability to introduce evidence to support their theory of just compensation, defendants stipulated to judgment using the City's valuation based on unentitled land value and reserved the right to appeal.

On appeal, defendants contend the trial court erred as a matter of law by adopting a valuation method that conflicts with key principles governing the determination of just compensation in eminent domain proceedings. The City disputes the de novo standard of review proposed by defendants and maintains the court did not abuse its discretion in barring the introduction of evidence to support the defendants' valuation methodology.

For the reasons explained herein, we decide the trial court did not abuse its discretion in granting the City's motion and affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. *The Property*

The property is a narrow, curved parcel of approximately four acres of undeveloped land in a residential neighborhood near downtown Morgan Hill. In 1976, Garcia, an experienced developer and home builder, acquired the property and adjacent land (referred to as "Spring Hill") with the intention of developing it for housing. Garcia learned prior to completing the purchase

---

[2] All further unspecified references are to the Code of Civil Procedure.

2

that the property was the location of a planned road extension of Santa Teresa Boulevard and Hale Avenue (the road extension), which had been identified as a planned arterial in the City's general plan since 1969. The city manager at the time informed Garcia that the property should be held for later purchase by the City. Based on this information, Garcia did not expect to build homes on the property portion of the land acquired.

In 1979, after Garcia had subdivided and developed the land to the north and south of the property, the City approved the 30-lot subdivision map for "Spring Hill Estates 3." Spring Hill Estates 3 included 28 lots for single family homes, reserved one lot (Lot 30) for future development, and designated the area comprising the property as "Lot 29."

The property appeared on the subdivision map as "Lot 29" – " 'Future Santa Teresa' " in the narrow and curved shape of the road extension. The shape of Lot 29 was dictated by the shape of the road extension. Had the City not required the property to be set aside for the road extension, Garcia asserts that he would have integrated the development of Lot 29 with that of Lots 1 through 28 in Spring Hill Estates 3.

*B. City Planning Measures*

In 1977 (the year after defendants purchased the property), the City's voters adopted by initiative the first in a series of residential development control system (RDCS) ordinances designed to limit population growth and provide a method for evaluating proposed residential developments. Measure C, codified as section 18.78.020 of the City's municipal code, is the relevant version of the City's RDCS. Measure C restricted residential development in the City to a system of development allotments and established a competition for allocating the limited number of allotments each year. The City awarded development allotments to the projects that received the highest scores in the

3

competition. A property owner could not file a tentative subdivision map unless the owner had first applied for and been awarded a development allotment by the City.

Measure C further required the City's planning officer to review each application for development allotment for conformity with the City's general plan.[3] If the planning officer determined the proposed development did not conform to the general plan, the application would be rejected. At least since 1980, the circulation element of the City's general plan has depicted a planned road extension across the property.

In 1996, while developing Lot 30 of Spring Hills Estates 3, Garcia discovered that a condition for offer of dedication had been imposed on the 1979 subdivision map. The condition apparently required defendants to offer to dedicate Lot 29 when Lot 30 was developed. In October 1997, the city council rescinded by resolution the dedication requirement.[4] In 1998, the City recorded a quitclaim deed releasing any City rights to the property. The

---

[3] California law requires that each city adopt a general plan that is a long-range, comprehensive policy statement of a community's physical development. (Gov. Code, § 65300.) A general plan must include land use, circulation, housing, conservation, open space, noise, safety, and environmental justice elements. (*Id*., § 65302.) The circulation element of the general plan must show the "location and extent of existing and proposed major thoroughfares" and other public utilities, correlated with the land use element of the plan. (*Id*., subd. (b).)

[4] Resolution No. 5126, adopted by the City on October 15, 1997, states, inter alia, that the city council "has declined to purchase Lot 29, as future Santa Teresa right-of-way," "desires to rescind the . . . condition as listed" on the subdivision map, and "in order to facilitate development of Lot 29, the [c]ity [c]ouncil hereby authorizes and directs the [c]ity [m]anager to execute a quitclaim deed" that "will convey any and all rights that the City may have in Lot 29 to its present owner."

record does not show any action or steps taken by defendants between 1998 and 2013 toward developing the property.

*C. Implementation of the Road Extension and Measure C Application*

In 2007, the City took steps toward implementing the road extension. City staff included the road extension in the capital improvement program budget from 2007 through 2012. In 2008, the City purchased for $1,141,359 two acres immediately north of the property for the road extension. However, in 2012, City funding for the road extension project was eliminated due to the dissolution of the state's redevelopment agencies. Nevertheless, the circulation element continued to depict a planned roadway across the property.

In December 2013, the city council directed City staff to develop a plan to move forward with the road extension, and in 2014d City staff recommended authorizing funding for plan line design work for the road extension. Among other purposes, the plan line design was intended to "[c]larify intentions to construct a roadway for public purposes" and "[e]stablish right of way" widths and alignments.

In October 2013, during the period in which City funding for the road extension had been eliminated and before funding was reimplemented in 2014, Garcia sought to develop the property. On October 1, 2013, Garcia submitted a Measure C application for 25 residential allotments to build homes on a portion of the property and an adjacent property (2013 application). Civil engineer William McClintock, Garcia's designated expert to discuss the RDCS process and Garcia's 2013 application for building allotments, testified that at the time Garcia submitted the 2013 application, Garcia knew the proposed development was inconsistent with the circulation element of the City's general plan. McClintock agreed it was "questionable"

5

whether the City would accept the application because of the inconsistency with the circulation element.

In a letter dated October 14, 2013, City staff informed Garcia that the 2013 application had to be rejected because the proposed development was inconsistent with the circulation element of the City's general plan showing the planned segments of the road extension on the property. The City's letter stated that Garcia "may choose to apply for an amendment to the [g]eneral [p]lan that could facilitate your proposed development in the future." Garcia appealed the decision to the city council. On November 20, 2013, based on the analysis provided by City staff, the city council rejected the appeal, upheld the decision to reject Garcia's 2013 application, and directed Garcia to file an application to amend the general plan and to allow a consistency determination, should he wish to have the proposed development application move forward for processing and consideration.

As noted *ante*, in December 2013, following the city council's rejection of Garcia's 2013 application appeal, the city council directed staff to develop a plan to move forward with the road extension. In January 2014, City staff recommended the City authorize funding for plan line design work on the road extension in the 2014/2015 capital improvement budget. The city manager informed Garcia that the City was working to adopt the plan line design for the road extension and begin negotiations with Garcia to acquire the property.

In August 2017, City staff presented for city council approval the final environmental impact report for the road extension. The City and Garcia thereafter entered into a possession and use agreement dated October 3, 2018. The agreement required the City to deposit $3,563,200 into escrow as the amount of probable compensation for acquisition of the property and

6

allowed the City to take possession of the property as of November 19, 2018,[5] establishing it as the date for determining the value of the property.

*D. Eminent Domain Action*

In July 2021, the City filed its complaint in eminent domain. In February and March 2024, the parties exchanged expert witness disclosures and statements of valuation data pursuant to section 1258.210, et seq., including the City's supplemental list of expert witnesses and an amendment to defendants' expert witness disclosure and statement of value.

The City's appraisal expert, Terry Larson, valued the property as of November 21, 2018, in its existing condition as raw, unentitled land at $3,740,000. Defendants' appraisal expert, Norman Hulberg, valued the property as of November 21, 2018, at $8,010,000. Hulberg based his valuation on an assumption of reasonable probability that, but for the road extension project, defendants would have obtained residential land use entitlements through the RDCS process. Hulberg applied the "hypothetical condition" (capitalization & boldface omitted) that the "site is entitled for development with 22 attached and detached single-family homes." Hulberg therefore valued the property as if entitled for residential development.

---

[5] The judgment in condemnation with reservation of right to appeal states that the City acquired the legal right of possession of the property on November 19, 2018. The parties and expert witness declarations, however, refer to November 21, 2018, as the date of value. The record does not explain this apparent discrepancy, which in any event is inconsequential to our review.

*E. Order on Motion for Determination of Legal Issues*

In late March 2024, the City filed a motion for determination of legal issues pursuant to section 1260.040 (motion)[6] and supporting declarations and exhibits.  Defendants filed their opposition to the motion, together with supporting declarations and exhibits, and the City filed its reply brief and objections.

The motion sought to exclude evidence at trial related to (1) defendants' 2013 application for residential building allotments on the property, (2) the claim that if the project did not exist, it was reasonably probable the property would have received building allocations and a tentative map by the date of value, and (3) value comparisons based on sales of entitled land.  The City argued that defendants' valuation using entitled land value violates the principle of "fair market value" and misapplies the "project effect rule"[7] (codified at section 1263.330) in an attempt to base compensation on land use entitlements the property does not have.

Defendants countered by citing case authority they asserted made it "clear that in an eminent domain action the reasonable probability of land use approvals is an issue affecting value and is a question of fact addressed to

---

[6] Applicable to eminent domain actions, section 1260.040, subdivision (a) provides, "If there is a dispute between plaintiff and defendant over an evidentiary or other legal issue affecting the determination of compensation, either party may move the court for a ruling on the issue.  The motion shall be made not later than 60 days before commencement of trial on the issue of compensation.  The motion shall be heard by the judge assigned for trial of the case."  The provision was enacted "to promote earlier resolution of issues affecting the determination of compensation, thereby preventing these issues from improperly going to the jury and increasing the likelihood of pretrial settlement."  (*Weiss v. People ex rel. Dept. of Transportation* (2020) 9 Cal.5th 840, 855–856.)

[7] The parties also use the phrase "project influence rule" to refer to the same legal doctrine.

the jury." Defendants argued that the project effect rule requires the trial court to ignore the road extension designation in the circulation element and allow the jury to hear evidence regarding the highest and best use of the property. They contended that, in determining fair market value, the jury should be entitled to consider the evidence that, absent the road extension, there was a reasonable probability that defendants would have obtained approximately 22 building allocations through the RDCS process and obtained approval of a tentative subdivision map for those allocations.

The trial court heard oral argument and took the matter under submission. On May 23, 2024, the trial court issued its ruling from the bench, granting the City's motion. The court recited the bases for its decision, noting there was little disagreement between the parties about the applicable law and the "real question in this case is how to apply the law to the relatively unique facts." The court noted that the fact pattern of this case differed from typical eminent domain cases because the plan for the road extension was already in place when defendants acquired the property as unentitled land in 1976. It reasoned that at no time during defendants' ownership of the property did Garcia have an expectation—apart from the approximately two-year period between 2012 and 2014 (when the City terminated the project for lack of funding and then reinitiated the project by funding the plan line design)—that the property could gain entitlements and be developed. The trial court found that "[t]he exact shape of the property was dictated by the city in 1979 when the defendant developed the land around the proposed road with the housing that exists there today."

Based on these facts, the trial court concluded "it is fair . . . to consider the value of this land as unentitled land." The court ruled that defendants would be precluded from introducing evidence of the 2013 application for

9

building allotments, or any specific plan for development on the property, and that any appraisals using a comparison methodology would be compared to "unentitled property of a similar nature and not entitled property." As later set forth in the written order granting the motion (order): "[Defendants] [are] hereby barred from presenting any evidence, testimony, or argument at trial regarding: (a) [defendants]' 2013 Measure C [a]pplication; (b) whether it was 'reasonably probable' that the real property the City seeks to acquire from [defendants] in this eminent domain action (the 'Property') would have received land-use entitlements but for the Hale Avenue Extension Project; (c) any specific plan for the development of the Property; and (d) sales of allegedly comparable land that sold with land-use entitlements."

After the trial court granted the motion, defendants filed an offer of proof on June 18, 2024. Defendants' counsel described the filing as "a formal offer of proof" with the evidence defendants had sought to present in support of their excluded valuation approach. The trial court acknowledged defendants could place the information into the record for purposes of later review but emphasized that to the extent there was "anything new in that filing" that had not been presented with the motion and opposition, the trial court had not considered it in its decision and would not be using it to reconsider the order. The City filed written objections to the offer of proof, and defendants filed a response to the written objections supported by the declaration of counsel. The trial court did not rule on the City's objections or alter its ruling on the section 1260.040 motion.

*F. Entry of Judgment*

On August 5, 2024, the parties filed a stipulation for entry of judgment reserving right of appeal. The stipulation recited facts related to the City's acquisition of the property, each side's expert witness appraisal and

10

valuation, the City's motion and trial court's order, and set forth the basis for defendants' decision to enter into a stipulation in lieu of proceeding to trial without the excluded evidence.  Defendants stipulated to the judgment "solely to facilitate an appeal in light of the adverse determination" in the order.  Pursuant to the stipulation, the trial court entered judgment in condemnation with reservation of right of appeal (judgment) on August 16, 2024, requiring compensation of $3,740,000, plus specified statutory and other costs.  Defendants timely appealed.

## II.  DISCUSSION

Defendants contend that the trial court's order failed to apply the project effect rule and erroneously excluded admissible evidence supporting defendants' fair market value claim.  The City counters that defendants' proposed application of the project effect rule and reasonable probability principles is fundamentally incompatible with fair market value, and the trial court reasonably exercised its discretion to exclude the inadmissible evidence.

*A. Governing Principles*

The takings clauses of the state and federal constitutions prohibit the taking of private property for public use without just compensation.  (U.S. Const., 5th Amend.; Cal. Const., art. 1, § 19; see *City of Perris v. Stamper* (2016) 1 Cal.5th 576, 591 (*City of Perris*); *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 698 (*Continental*).)

The concept of just compensation "is primarily aimed at making a landowner whole for any governmental taking or damage to his or her property."  (*Continental, supra,* 16 Cal.4th at p. 715.)  Just compensation " 'is to be measured by the loss caused to' " the property owner (*ibid*.), who " 'is

11

entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public.' " (*Ibid*.) Stated differently, just compensation "must put the owner 'in as good position pecuniarily as [the owner] would have occupied if [the] property had not been taken.' " (*City of San Diego v. Barratt American Inc.* (2005) 128 Cal.App.4th 917, 933 (*Barratt*); accord, *Escondido Union School Dist. v. Casa Suenos De Oro, Inc.* (2005) 129 Cal.App.4th 944, 959 (*Escondido*).)

"In California, eminent domain proceedings are governed by a comprehensive statutory scheme, known as the Eminent Domain Law. (§ 1230.010 et seq.)" (*Escondido, supra*, 129 Cal.App.4th at p. 959.) Under the eminent domain law, "the measure of compensation in a condemnation case 'is the fair market value of the property taken.' " (*City of Perris, supra*, 1 Cal.5th at p. 598, quoting § 1263.310.)

Section 1263.320, subdivision (a) defines fair market value of the taken property as "the highest price on the date of valuation that would be agreed to by" a seller and a buyer under defined circumstances.[8] The analysis of fair market value under this rubric "begins with a determination 'of the highest and best use to which the property being condemned can be put.' " (*Barratt, supra*, 128 Cal.App.4th at p. 933.) This determination " 'is not necessarily limited to the current zoning or land use restrictions imposed on the property; the property owner "is entitled to show a reasonable probability of a

---

[8] Section 1263.320, subdivision (a), states in full: "The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available."

zoning [or other change] in the near future and thus to establish such use as the highest and best use of the property." ' " (*Id*. at pp. 933–934.)

Consequently, " 'the fair market value of property taken has not been limited to the value of the property as used at the time of the taking, but has long taken into account the "highest and most profitable use to which the property might be put in the reasonably near future, to the extent that the probability of such a prospective use affects the market value." ' " (*Metropolitan Water Dist. of So. California v. Campus Crusade for Christ, Inc.* (2007) 41 Cal.4th 954, 965 (*Campus Crusade*); *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 868 (*Decker*).)

The project effect rule, codified at section 1263.330, excludes from fair market value " 'any increase or decrease in the value of the property' " attributable to the project for which the property is being taken. (*City of Perris*, *supra*, 1 Cal.5th at p. 600.) Under the statute, "The fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to any of the following:  [¶]  (a)  The project for which the property is taken.  [¶]  (b)  The eminent domain proceeding in which the property is taken.  [¶]  (c)  Any preliminary actions of the plaintiff relating to the taking of the property." (§ 1263.330.)

The project effect rule "serves to prevent the amount of compensation owed for a taking from being altered by the project served by the taking or by any government action that affects the value of an intended taking." (*City of Perris*, *supra*, 1 Cal.5th at p. 600.)  For example, "if the government is condemning property to build a reservoir, it need not pay lakefront prices for the property.  And if the government is condemning property to build a sewage plant, it does not get a discount because its project renders the property less desirable." (*Id*. at p. 601.)

13

*B. Standard of Review*

The parties dispute the applicable standard of review. Garcia contends our review of the trial court's order is de novo because the effect of the court's exclusionary ruling is tantamount to a nonsuit on the issue of just compensation. (See, e.g., *City of Livermore v. Baca* (2012) 205 Cal.App.4th 1460, 1465 (*Baca*); *Garner v. BNSF Railway Co.* (2024) 98 Cal.App.5th 660, 673–674 (*Garner*); *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 677 (*Kelly*).) The City, on the other hand, maintains that courts review for abuse of discretion the admission or exclusion of evidence concerning value and valuation methods in eminent domain cases. (See, e.g., *Barratt*, *supra*, 128 Cal.App.4th at p. 936; *City of San Diego v. Rancho Penasquitos Partnership* (2003) 105 Cal.App.4th 1013, 1027 (*RPP*).)

We agree with the City on the applicable standard of review. In essence, the trial court's decision excluded evidence defendants sought to admit in support of their experts' valuation testimony. Such a decision is reviewed for abuse of discretion. (See *RPP, supra,* 105 Cal.App.4th at p. 1027.)

In *Barratt*, for example, the owners of real property condemned for freeway construction moved in limine to preclude the city's appraisers from employing a method of valuation referred to as the "abandoned [p]roject construct." (*Barratt*, *supra*, 128 Cal.App.4th at p. 923.) The city asserted that its method properly disregarded the influence of the highway project on the value of the property by assuming the project was abandoned on the valuation date. (*Id.* at pp. 923, 928.) The owners proposed an alternative method for disregarding the project impact founded on the fiction that the highway project had never been conceived or planned ("the no [p]roject construct"). (*Id.* at p. 928.) The trial court granted the owners' motion

14

barring the city's experts from valuing the property using the abandoned project construct. (*Id*. at p. 929.)

On appeal, the appellate court reviewed the trial court's in limine ruling on valuation methods for abuse of discretion. (*Barratt, supra,* 128 Cal.App.4th at p. 936.) It explained, " ' " ' "In condemnation proceedings, the trial court is vested with considerable judicial discretion in admitting or rejecting evidence of value." ' " ' [Citation.] Where, as here, 'an expert in a condemnation action employs a methodology not sanctioned by California law, his opinion may be excluded.' " (*Ibid*.)

In reviewing the trial court's ruling for abuse of discretion, *Barratt* accords with other appellate decisions reviewing trial court orders related to the evidence underlying measures of valuation. (See, e.g., *RPP, supra,* 105 Cal.App.4th at p. 1027; *County Sanitation Dist. v. Watson Land Co.* (1993) 17 Cal.App.4th 1268, 1277 (*Watson*).) This approach is also consistent with *Merced Irrigation Dist. v. Woolstenhulme* (1971) 4 Cal.3d 478 (*Woolstenhulme*), in which our Supreme Court examined whether increased land values attributable to speculation about a proposed project comprise an element of the just compensation to a landowner whose land is taken for the project. (*Id*. at pp. 483–484.) In *Woolstenhulme*, the court described " '[t]he admissibility of testimony relating to comparable sales' " (*id*. at p. 503) as " 'largely in the discretion of the trial court' " and subject to review for abuse of discretion. (*Ibid*.)

We reject defendants' reliance on *Baca* to argue the trial court's ruling effectively granted a motion for nonsuit. (*Baca, supra,* 205 Cal.App.4th 1460.) There, a landowner sought permanent and temporary severance damages in response to the plaintiff city's takings action affecting portions of the landowner's commercial property. (*Id*. at p. 1464.) After evidentiary

15

hearings, the trial court found that the evidence proffered in support of severance damages was insufficient and granted the city's in limine motion to exclude all evidence of temporary and permanent severance damages. (*Ibid.*) On appeal from the stipulated judgment to review the evidentiary ruling, the Court of Appeal reviewed the exclusionary ruling de novo. It explained, "When, as in the present case, the court's order excludes all evidence on a particular claim and, as a result, operates as a motion for nonsuit, we review the court's order de novo, examining the record in the light most favorable to the party offering the evidence." (*Id*. at p. 1465.)

This case is not analogous to *Baca*. The exclusion of evidence pertaining to defendants' probability of having obtained entitlements for the property and ability to use comparison values based on entitled land does not preclude defendants from submitting evidence to support their claim for compensation. Nor does it deprive defendants "of essential evidence" on an element, like causation or damages, resulting in a dismissal before trial. (*Garner*, *supra*, 98 Cal.App.5th at p. 674.)

Here, as in *Barratt*, the trial court considered what theory of fair market value, supporting evidence, and expert testimony may be appropriately presented to the jury. That the ruling deprived defendants of the ability to introduce evidence supporting their valuation claim based on a significantly higher measure of compensation (i.e., entitled versus unentitled land) does not transform the ruling into a nonsuit with the effect of preventing defendants from offering any evidence to support the claim for just compensation. (Cf. *Kelly*, *supra*, 49 Cal.App.4th at p. 677.) The admissibility of this evidence is a determination subject to the trial court's " ' " ' "considerable judicial discretion in admitting or rejecting evidence of value." ' " ' " (*Barratt*, *supra*, 128 Cal.App.4th at p. 936.)

16

Even so, "[t]he abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.)

Even in matters left to the sound discretion of the trial court, its discretion is bounded. " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' . . . To determine if a court abused its discretion, we must thus consider 'the legal principles and policies that should have guided the court's actions.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).) In the context of a condemnation action, a court acts within its discretion to exclude a valuation method that fails to comply with the applicable principles of law governing the determination of just compensation. (*Barratt*, *supra*, 128 Cal.App.4th at p. 936; *Watson*, *supra*, 17 Cal.App.4th at p. 1277.)

We turn to whether the trial court in this matter exceeded "the confines of the applicable legal principles" (*Sargon*, *supra*, 55 Cal.4th at p. 773) by barring evidence to support defendants' theory for valuing the property as entitled land. In making this determination, we review the " 'the ruling of the trial court, not its rationale, and may affirm a trial court ruling on any proper basis presented by the record, whether or not relied upon by the trial court.' " (*Ross v. Superior Court* (2022) 77 Cal.App.5th 667, 681.)

17

*C. Analysis*

Defendants' argument attacking the trial court's order proceeds in two steps. Defendants first assert the trial court misapplied the project effect rule, which (in their view) should have barred any consideration of the road extension's existence or effect on value and requires the court to treat the road extension as though it never existed. Second, they contend the court erred in barring evidence related to Garcia's earlier application to develop the property. They maintain that, absent the road extension project, it was reasonably probable that Garcia would have obtained land use entitlements through the RDCS competition, enhancing the fair market value of the property.

We first consider the trial court's ruling on the project effect rule.[9]

The project effect rule is codified in section 1263.330. Subdivision (a) of section 1263.300—the provision most relevant here—in turn incorporates the rule announced by the California Supreme Court in *Woolstenhulme, supra*, 4 Cal.3d 478. (See *City of Perris, supra*, 1 Cal.5th at p. 600.) The Supreme Court in *Woolstenhulme* decided that "a property owner can be compensated for increases in valuation that result from a property's proximity to a proposed project, *up to the point that it becomes probable the property will be included in the project.*" (*Id.* at p. 601, italics added.) As this language suggests, "the date of probable inclusion in a project is important in applying subdivision (a) of section 1236.330." (*Id.* at p. 602.)

---

[9] Defendants do not argue that the jury, rather than the court, should have determined the application of the project effect rule. By contrast, defendants contend that the second step of their argument (involving the reasonable probability of a change in land use restrictions) is an issue of fact for the jury.

18

In *Woolstenhulme,* the California Supreme Court considered the fair market value of land where "a plan to increase and stabilize the size of a lake and to develop recreational facilities led to a rise in the value of land near the lake. By 1963, the public became aware of the plan, and land values began to rise. In 1965, it became probable that the defendant's property would be taken for the lake improvement. In 1967, the irrigation district sought to condemn the defendant's land." (*City of Perris*, *supra*, 1 Cal.5th at p. 601.)

Our Supreme Court affirmed that the defendant should not be compensated for any enhancement of value attributable to public knowledge of the project after January 1, 1965. (*Woolstenhulme*, *supra*, 4 Cal.3d at p. 499.) The court reasoned that once a property "has been designated for condemnation" (*id*. at p. 491), any increase in value "is clearly not a legitimate element of just compensation and . . . such increases in value cannot properly be taken into consideration in determining the fair market value contemplated by our constitutional just compensation requirement." (*Id*. at p. 492.) Similarly, the fair market value should *not* reflect any increase in value " '[i]f it is known from the very beginning exactly where the improvement will be located if it is constructed at all.' " (*Id*. at p. 496.)

The court in *Woolstenhulme* acknowledged "a variety of linguistic tests in describing the requisite 'certainty of inclusion' that is required before 'project enhanced value' should be excluded." (*Woolstenhulme*, *supra*, 4 Cal.3d at p. 497, fn. 10.) It decided that "the 'probability of inclusion' standard" (*ibid*.) "is the appropriate one to be utilized in future cases." (*Ibid*.) Further, "Although *Woolstenhulme* concerned a limitation on an owner's right to have the value of its property enhanced by probable condemnation, its logic applies equally to limit the condemner's right to capitalize on the diminution

19

of property value after probable condemnation." (*City of Perris, supra,* 1 Cal.5th at p. 601.)

The flaw in defendants' application of the project effect rule on these facts is that it is undisputed that the property at issue has been identified as the site of the road extension—and thus subject to probable condemnation—since before they purchased it. Under the logic of *Woolstenhulme,* the fair market value was set at the time that defendants purchased the property—not as to the precise value of the land—but as to "the uses and purposes for which the property is reasonably adaptable and available." (§ 1263.320, subd. (a).)

In other words, the trial court did not abuse its discretion in excluding a theory of valuation premised on the nonexistence of the project because the project has been included in the fair market value since before defendants purchased the property. Using the example at issue in *Woolstenhulme,* it is as if the property owner knew her land, prior to its purchase, would be condemned to expand the lake and would never be lakefront property. In defendants' case, they knew since the time of purchase it was reasonably probable that the property would be condemned and did not anticipate building homes on it.[10]

---

[10] As defendants did not seek to develop the property between 1998 and 2007 (a period where there was considerably more uncertainty about the probability of the road project (see *ante,* pt. I.B.)), we need not consider whether a different result would have been obtained in that timeframe. Furthermore, while defendants may dispute the legal significance of the City having included the road extension in the general plan since as early as 1969, defendants have not, as a factual matter, challenged Garcia's statement that he was advised at the time of purchasing the property that the City intended to acquire it.

We do not conclude the project effect rule has no impact here. The project effect rule dictates that defendants' property should be valued in its existing state—i.e., unentitled, residentially zoned land—rather than its future use as a roadway. But the value of the property should not (under the logic of *Woolstenhulme*) be assessed using a more valuable, alternate use, such as having entitlements to residential development, after its probable inclusion in the project sometime prior to 1976.

Although the trial court did not make an explicit ruling on the date of probability of inclusion, its oral explanation of its decision implicitly rested on such a finding. As the court stated, "when the property was acquired by the defendant in 1976, there was already a plan in place to install the road on the property at issue . . .. The road extension had been part of the city's planning documents since 1969. . . . [¶] . . . [¶] So except for a period from 2012 to 2014, there has never been a time that the defendant has owned this property where there has been an expectation that it would be able to be entitled and developed." Further, the court found that "exact shape" of the property was dictated by the planned road extension.

The trial court's finding that the property's probable inclusion in the road project predated defendants' purchase of the property is supported by substantial evidence. The evidence that defendants understood, upon acquiring the property and surrounding parcels, that the City intended to acquire the property for public use, considered together with evidence of the City's efforts at several junctures to initiate the road extension project, all support the trial court's conclusion. The trial court's findings with respect to the specificity of the planning with respect to the road extension, and defendants' knowledge that the property would be used for the road extension distinguish the facts here from a general plan that is "merely tentative and

21

subject to change" (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 118) and dependent "upon unpredictable future events" (*ibid.*). We therefore reject the first step in defendants' attack on the trial court's ruling.

We also are not persuaded—even assuming the trial court erred in its application of the project effect rule—that the court erred in excluding evidence of reasonable probability of obtaining development entitlements. Defendants' theory of value is that but for the road extension, it is reasonably probable they would have obtained entitlements in the form of building allocations and subsequent approval of a tentative subdivision map for the property *as of* the date of value. Defendants acknowledge that their position (based on events prior to the date of value) does not find direct support in any published cases and is contrary to the relevant pattern jury instruction. (See California Civil Jury Instruction (CACI) No. 3503.) CACI No. 3503 states, "A determination of the property's highest and best use is not necessarily limited by current zoning or land use restrictions. If you decide that as of [insert date of valuation] there was a reasonable probability of a change in zoning or other use restrictions *in the near future*, then you must determine the highest and best use of the property based on that change." (*Ibid.*, italics added.)

The California Supreme Court's articulation of reasonable probability in the context of fair market value is also forward looking. In *Campus Crusade*, the court reaffirmed that " '[w]here due to zoning restrictions the condemned property is not presently available for use to which it is otherwise geographically and economically adaptable, the condemnee is entitled to show a reasonable probability of a zoning change in the near future and thus to establish such use as the highest and best use of the property.' " (*Campus Crusade*, *supra*, 41 Cal.4th at p. 967; see also *San Diego Gas & Electric Co. v.*

22

*Schmidt* (2014) 228 Cal.App.4th 1280, 1289 (*Schmidt*) [defining "highest and best use" of the condemned property "as 'that use, among the possible alternative uses, that is physically practical, legally permissible, market supportable, and most economically feasible.' "].)

*Campus Crusade* clarified the trial court's gatekeeping role when a property owner seeks to establish a reasonable probability of rezoning (or other change in land use restriction) as the highest and best use: "Before such evidence may be presented to the jury, . . . the trial court must first determine whether there is sufficient evidence that would permit a jury to conclude there is a reasonable probability of rezoning in the near future. Evidence of a reasonable probability of a zoning change in the near future ' "must at least be in accordance with the usual minimum evidentiary requirements, and that which is purely speculative, wholly guess work and conjectural, is inadmissible." ' [Citation.] The evidence, if credited, must also be sufficient to establish that rezoning is reasonably probable. [Citation.] If the trial court determines that no fact finder could find a reasonable probability of rezoning on the record presented, it may exclude all evidence and opinions of value based on a use other than that authorized by the existing zoning. [Citations.] If, on the other hand, the trial court determines that there is sufficient evidence of a reasonable probability of rezoning to warrant submitting the issue to the jury, it is for the jury, in considering the weight to be given valuation testimony based upon a reasonable probability of rezoning, to determine whether there was a reasonable probability of rezoning and, if so, its effect on the market value of the property." (*Campus Crusade, supra*, 41 Cal.4th at p. 968.)

Defendants maintain that the model jury instruction and language in case law referring to "reasonable probability of rezoning in the near future"

(*Campus Crusade*, *supra*, 41 Cal.4th at p. 968) merely reflect the factual circumstances of those published cases. These cases have typically involved owners' attempts to show that in the absence of the taking, they could have obtained the desired zoning or land use approvals in the near future. (See, e.g., *People ex rel Dept. of Public Works v. Graziadio* (1964) 231 Cal.App.2d 525, 530 [showing that but for the project and public agency's request to city council to retain residential zoning, property would have been rezoned for commercial use along with neighboring properties]; *Barratt*, *supra*, 128 Cal.App.4th at p. 928 [showing that absent the highway project, development pressures and the city's land use priorities would have caused the city to remove the agricultural zoning density to permit higher density development and address increased traffic needs].) Defendants assert that while none of the cases addresses a scenario in which the owner sought the desired approvals or zoning change before the condemnation action but was denied because the request was inconsistent with the project for which the condemnation action was later filed, neither does the law preclude application of the reasonable probability principle to that fact pattern.

We disagree with defendants that the inquiry into highest and best use of the condemned property may include a showing of fair market value based on a retrospective view of reasonable probability. Highest and best use is an inquiry into which " 'among the possible alternative uses, . . . is physically practical, legally permissible, market supportable, and most economically feasible' " (*Schmidt*, *supra*, 228 Cal.App.4th at p. 1289) as of the date of valuation. In appropriate circumstances, that inquiry may extend to evidence that there is a reasonable probability the condemned property may be rezoned or secure a valuable change in land use restrictions *in the near*

24

*future* (*Barratt*, *supra*, 128 Cal.App.4th at pp. 933–934[11]; *Campus Crusade*, *supra*, 41 Cal.4th at p. 965; *Decker*, *supra*,18 Cal.3d at p. 868), because the probability of obtaining such a change is relevant to "the market value of the property." (*Campus Crusade*, at p. 968.)

We decline to extend the reasonable probability doctrine to the novel, retrospective inquiry advocated by defendants. Evidence of a hypothetical, past possibility that without the project, the property could have been upzoned, or might have received an entitlement for development, is not persuasive to establish fair market value as of a later date of valuation. The statutory definition of fair market value reinforces this understanding of the law by providing that the seller and buyer in the hypothetical transaction are each possessed "with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (§ 1263.320, subd. (a).) This inquiry is necessarily forward looking. " 'A jury should consider all those factors, including lawful legislative and administrative restrictions on property, *which a buyer would take into consideration in arriving at the fair market value.'* " (*City of Perris*, *supra*, 1 Cal.5th at p. 599, italics added.)

---

[11] At oral argument, defendants' counsel contended that the valuation method permitted in *Barratt*, like that proposed by defendants here, turned on showing a reasonable probability that "the taken property would have been upzoned prior to the valuation date." (*Barratt*, *supra*, 128 Cal.App.4th at p. 923.) But whether the higher density zoning at issue in *Barratt* would have occurred (absent the highway project) by or shortly after the valuation date does not alter our conclusion. Unlike in *Barratt*, the valuation method proposed by defendants does not turn on the reasonable probability of a zoning or use change supported by land use policies and developments that were occurring during the relevant time frame but on the speculation that defendants would have prevailed in the 2013 competition under Measure C to obtain the specific development entitlements they sought for the property that year.

We decide that the trial court's decision to exclude this evidence at trial was within the reasonable scope of its discretion based on the applicable legal principles.  (*Sargon, supra,* 55 Cal.4th at p. 773.)

## III.  DISPOSITION

The judgment is affirmed.  Respondent City of Morgan Hill is entitled to its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_____
Danner, Acting P. J.

WE CONCUR:


_____
Lie, J.



_____
Bromberg, J.



**H052498**
***City of Morgan Hill v. Garcia et al.***